Richard T. Drury (SBN 163559)
richard@lozeaudrury.com
Rebecca Davis (SBN 271662)
rebecca@lozeaudrury.com
**LOZEAU DRURY LLP**
1939 Harrison, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200
Facsimile: (510) 836-4205

**WOODROW & PELUSO, LLC**
Patrick H. Peluso*
ppeluso@woodrowpeluso.com
Taylor Smith*
tsmith@woodrowpeluso.com
3900 East Mexico Avenue, Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0676
Facsimile: (303) 927-0809

**Pro Hac Vice*

*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| **MICHELLE SHULTZ**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**TTAC PUBLISHING, LLC**, a Nevada limited liability company,<br><br>Defendant. | Case No. 4:20-cv-4375-HSG<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, STRIKE CLASS CLAIMS AND/OR STAY PROCEEDINGS**<br><br>**Date: Oct. 22, 2020**<br>**Time: 2:00 p.m.**<br>**Courtroom: 2, 4th Floor** |

## I.     INTRODUCTION

This case challenges Defendant TTAC Publishing, LLC's ("Defendant" or "TTAC") serial violations of the Telephone Consumer Protection Act ("TCPA"). Specifically, TTAC—on its own or through an agent acting on its behalf—bombards consumers' cell phones with unsolicited, autodialed text messages without obtaining prior express consent. In response to Plaintiff's complaint, TTAC asks the Court to compel arbitration of Plaintiff's claims, to strike her class pleadings, and to stay the case pending either an arbitration ruling or, in the alternative, the Supreme Court's ruling in *Facebook Inc. v. Duguid*, No. 19-511 (U.S. July 9, 2020), a case concerning the definition of an automated telephone dialing system ("ATDS"). However, neither the arbitration agreement nor the class action waiver that Defendant has presented is enforceable against Shultz for her TCPA claim, and a stay pending resolution of the *Duguid* case is neither supported nor supportable. As such, and as explained further below, the Court should deny TTAC's motion in its entirety.

Defendant's motion to compel arbitration, to strike class claims, and to stay pending arbitration are all premised on the existence of an agreement to arbitrate Plaintiff's claims. However, the supposed "agreement" proffered by TTAC is unenforceable here for multiple reasons. First, the declaration and website screenshots provided by TTAC are insufficient to demonstrate that Plaintiff was notified of or assented to Defendant's terms and conditions, including the arbitration clause. In fact, they reveal that TTAC's website was insufficient to support an agreement with any similarly-situated class member. Second, even if the Court were to find that a contract was formed, the terms of the arbitration agreement do not apply to Plaintiff's claim, which falls outside of the provision's scope. Likewise, the class action waiver is so overly broad and ambiguous as to be substantively unconscionable, and it cannot be made to apply to Plaintiff's claim.

Defendant's alternative motion to stay pending the *Duguid* decision is similarly meritless. TTAC's brief argument to stay the case is flawed—while the Supreme Court may alter the

1  definition of an ATDS, Plaintiff has sufficiently pleaded the use of an ATDS under either

2  standard, and the true nature the dialing equipment that was used to send messages to Shultz and

3  the class must be learned through discovery. The *Landis* factors for granting a stay do not favor

4  TTAC's request, and Plaintiff would suffer prejudice if discovery were delayed. Accordingly, the

5  Court should deny Defendant's Motion in its entirety.

6  **II.   BACKGROUND**

7  On June 30, 2020, Shultz filed her Complaint, alleging that TTAC violated the TCPA by

8  sending unsolicited, autodialed text messages to her cellphone and to the cellphones of numerous

9  other consumers, none of whom gave prior express consent to receive such texts. (*See* Compl.,

10 dkt. 1 at ¶¶ 9–10, 36.) As will be proven at the appropriate time following classwide discovery,

11 Plaintiff seeks to certify a class action on behalf of all consumers who, like Plaintiff, received

12 repeated unsolicited, autodialed text messages from Defendant. (*Id.* ¶ 27.) To redress TTAC's

13 unlawful telemarketing conduct, Plaintiff seeks statutory damages for herself and the class, as

14 well as injunctive relief requiring Defendant to cease its unauthorized autodialed text messaging

15 activity. (*Id.* ¶ 26.)

16 In response to Plaintiff's Complaint, TTAC has filed a motion to compel arbitration. (Def.

17 Mot. to Compel, Dkt. 14.) In support of its motion, Defendant has submitted a Declaration of Ty

18 Bollinger, the chief financial officer of TTAC. (Dkt. 14-1.) Bollinger contends in his declaration

19 that Plaintiff agreed to arbitrate any claims against Defendant as part of purchasing a product

20 from TTAC's website. (*See id.* at ¶¶ 5, 7, 9, 15–16.) The declaration also contains an HTML

21 representation of TTAC's checkout website, which shows the purchase page and the hyperlink to

22 the terms and conditions that Plaintiff supposedly accepted "by clicking the 'Complete Purchase'

23 button." (*Id.* at ¶¶ 5, 15.) Additionally, TTAC provided excerpts of its website terms, including

24 the mandatory arbitration clause, which states, in relevant part, as follows:

25   While we will make reasonable efforts to resolve any disagreements you may have
26   with Company [TTAC], if these efforts fail you agree that all claims, disputes or

27

28 RESPONSE IN OPPOSITION TO                    3
   MOTION TO COMPEL ARBITRATION                           Case No. 4:20-cv-4375-HSG

> controversies against Company arising out of this User Agreement, or the purchase of any products or services ("Claims") are subject to fixed and binding arbitration . . . no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek.

(Dkt. 14-2.) TTAC also provided the text of a waiver of the right to any trial by jury, class action, or "other representative proceeding of any kind" with no apparent limitation. (Dkt. 14-3.)

## III.  ARGUMENT

### A.  Plaintiff's TCPA Claim Is Not Subject To Any Agreement To Arbitrate.

As stated above, Defendant's various requests to compel arbitration, strike class claims, and stay the case rely on the existence of a valid and enforceable agreement between TTAC and Plaintiff. Defendant has submitted the Bollinger Declaration in an attempt to evince such an agreement. However, the provisions and screenshots included with the Motion and in the Declaration do just the opposite.

In general, the Federal Arbitration Act ("FAA") embodies "the basic precept that arbitration 'is a matter of consent, not coercion.'" *Berman v. Freedom Fin. Network, LLC*, Case No. 18-cv-01060-DMR, 2018 WL 2865561, at *1 (N.D. Cal. June 11, 2018) [hereafter *Berman I*] (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)). Arbitration is a matter of contract, but because the FAA leaves courts with little discretion to preside over matters covered by a valid agreement to arbitrate, "[t]he court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply." *Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL 5210912, at *1 (N.D. Cal. Sept. 1, 2020) [hereafter *Berman II*] (quoting *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014)) (emphasis in original). TTAC's alleged "agreement" fails on both counts. As explained below, (1) the

agreement is not valid and enforceable because Defendant cannot adequately demonstrate assent by Plaintiff or the class members, and (2) even if the agreement were valid, it does not encompass Shultz's TCPA claim.

### 1. TTAC did not adequately notify or obtain assent from Shultz or the class members to support enforcement of its website terms, including the clause mandating arbitration.

Defendant is eager to compel Shultz to arbitrate her claims, but it cannot do so in the absence of a valid agreement to arbitrate. Determining whether the parties actually entered into an enforceable agreement is one of the Court's important roles in considering whether to compel arbitration. *See Chiron*, 207 F.3d at 1130. Even in the context of internet commerce, the basic principles of contract law remain the same: a mutual manifestation of assent "is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *see also Berman I*, 2018 WL 2865561, at *4 ("There is no contract until there is mutual consent of the parties.").

In general, internet contracts fall into one of two categories: clickwrap agreements, when users are required to click on an "I Agree" box after being presented with terms and conditions; and browsewrap agreements, when terms and conditions are posted via hyperlink at the bottom of a webpage. *Nguyen*, 763 F.3d at 1175–76. In some cases, websites present a hybrid of these two categories (sometimes referred to as "hybridwrap") by including a link to terms and conditions, often near a button that users must click to continue. *Berman II*, 2020 WL 5210912, at *2. In *Nguyen*, the Ninth Circuit considered a hybridwrap agreement, to which it applied browsewrap principles:

> Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.
>
> . . .

> But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage.

*Nguyen*, 763 F.3d at 1176–77 (citations omitted). The Court went on to note that, though the "Terms of Use" link was presented near a button that the user needed to click to proceed with checkout, "the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice." *Id.* at 1178. The Barnes and Noble arbitration agreement otherwise failed to admonish website users to actually *review* the terms of use before proceeding. *Id.* Ultimately, the Ninth Circuit held that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1178–79. Due to the range of technological savvy of internet users and the resulting imbalance of bargaining power in internet contracts, "the onus must be on website owners" to adequately notify consumers and obtain their assent in order to bind them to terms. *Id.* at 1179.

Here, the website layout as demonstrated by TTAC's screenshots is similar to that analyzed in *Nguyen*. The only apparent indication of terms and conditions is a very small hyperlink located above the large "Complete Purchase" button. (Dkt. 14-1 at ¶ 5.) This would be considered a "hybridwrap" presentation of terms and conditions, but there is no admonition or notice to consumers that they must review the terms, as was fatal to notice and assent in *Nguyen*. Additionally, the screenshots submitted by TTAC in the Bollinger declaration are completely blank—as was the case in *Berman*, these are "the equivalent of blank form contracts, with no clear indication that [Shultz or any other class member] agreed to them." *Berman II*, 2020 WL 5210912, at *3. Bollinger lists some personal information that Plaintiff supposedly provided when

1   using the website (*see* dkt. 14-1 at ¶ 8), but the burden is on TTAC to demonstrate an enforceable
2   agreement, and it has not done so.
3         Defendant may argue that, because the hyperlink appears next to a checkbox that reads "I
4   agree to the terms and conditions," this was supposedly adequate to put consumers on notice and
5   manifest assent to the terms. However, it is crucial to note that the checkbox, as it appears in the
6   blank form screenshots in Bollinger's declaration, is already checked. (Dkt. 14-1 at ¶¶ 5, 9.) By
7   TTAC's own evidence, it appears that consumers were not required to check this box because it
8   was already checked for them. In other words, would-be purchasers were not required to take any
9   affirmative action to demonstrate their assent to the terms because the box was already checked.
10  *See Nguyen*, 763 F.3d at 1178–79.  Indeed, Bollinger does not assert that Shultz checked this
11  box—he claims that she indicated agreement simply by "clicking the 'Complete Purchase'
12  button." (*Id.* at ¶ 15.) This further indicates that TTAC's website does not adequately notify
13  consumers of the terms or obtain their assent thereto.
14        In short, Defendant did not provided Shultz or its consumers with adequate notice of its
15  hybridwrap terms, including the mandatory arbitration clause. Without adequate notice, Plaintiff
16  could not and did not manifest assent to those term, and there is no enforceable agreement to
17  arbitrate her claims. Accordingly, Defendant's Motion should be denied.

      **2.    Even if TTAC's website terms were enforceable, Plaintiff's claim would fall outside the scope of the purported agreement to arbitrate.**

20        In light of the lack of notice and the absence of any manifestation of assent, TTAC should
21  not be permitted to enforce any "agreement" to arbitrate against Plaintiff. But even if the Court
22  were to decide that the arbitration provision is part of a valid agreement (it is not), Plaintiff's
23  TCPA claim is not within the stated scope of Defendant's mandatory arbitration clause. In other
24  words, if the Court were to reach the second point of analysis in *Chiron*, the purported agreement
25  to arbitrate still fails.
26        When an agreement to arbitrate exists, part of the Court's admittedly limited role under

RESPONSE IN OPPOSITION TO
MOTION TO COMPEL ARBITRATION       7       Case No. 4:20-cv-4375-HSG

the FAA is to consider whether the agreement encompasses the dispute at issue before compelling arbitration. *Chiron*, 207 F.3d at 1130. The presumption in favor of arbitration does not apply if "contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044–45 (9th Cir. 2009) (internal quotation omitted). Arbitration is a matter of contract and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Esparza v. SmartPay Leasing, Inc.*, 765 F. App'x 218, 219 (9th Cir. 2019) (quoting *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 923 (9th Cir. 2011)).

Here, the language of TTAC's arbitration clause purports to apply to "all claims, disputes or controversies against Company *arising out of this User Agreement, or the purchase of any products or services* ("Claims")." (Dkt. 14-2) (emphasis added). Though broad, this language would not apply to Plaintiff's TCPA claim even if she had agreed to the terms. For comparison, the District of Arizona recently considered even broader language—any claims that "arise out of or relate to this Agreement or any resulting transaction or relationship." *Briggs v. PFVT Motors LLC,* No. CV20-00478-PHX-GMS, dkt. 28 at 2 (D. Ariz. Sep. 9, 2020) (attached hereto as "Exhibit A"). Not even this language could be taken as broad enough to include claims for subsequent telemarketing:

> Here, the arbitration clause does not encompass the dispute at issue. The subject of this suit does not "touch matters" covered by the Agreement because this suit is the result of Defendant's *extra-contractual actions*, unrelated to the promises outlined in the parties' contract. The Agreement was for the purchase of a vehicle, and this suit concerns Defendant's *subsequent attempts to solicit new business*. Although courts interpret arbitration agreements broadly, they must be bound by some limiting principle which excludes wholly unrelated conduct between the parties. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991) ("The object of an arbitration clause is to implement a contract, not to transcend it."); *Smith v.*

*Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003) (explaining that "absurd results ensue" from an unlimited arbitration clause, such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated).

Ex. A at 4.

The same analysis applies in this case. The language in TTAC's clause does not encompass Plaintiff's TCPA claim. The text messages that she received were extra-contractual conduct and an attempt by TTAC or its agents to solicit new business. Further, Bollinger contends that Plaintiff's purchase occurred on April 13, 2018. (Dkt. 14-1 at ¶ 7.) The text messages at issue in the Complaint did not begin until November 2019—more than a year and a half later. (Dkt. 1 at ¶ 19.) The texts did not arise out of, or even relate to, the purported user agreement or the purchase of any products. Defendant's telemarketing occurred beyond the bounds of any purchase made by Plaintiff, and Shultz's claim does not fall within the alleged agreement to arbitrate.

As explained above, Plaintiff cannot be compelled to arbitrate because there is no valid agreement between herself and TTAC to do so. Nevertheless, if the Court finds that an agreement exists, it does not encompass the TCPA claim at issue in this action. Thus, under either prong of analysis set forth in *Chiron*, Defendant's motion should be denied because Shultz did not agree to arbitrate her claim.

### B.   The Class Action Waiver Included In TTAC's Terms Is Substantively Unconscionable Or Otherwise Not Enforceable As To Plaintiff's Claim.

In addition to seeking to compel arbitration (to which Plaintiff did not agree), Defendant asks the Court to strike Plaintiff's class claims pursuant to a "class action waiver" present in its terms and conditions. (Dkt. 14 at 9–12.) TTAC's argument fails for several reasons.

First, and as discussed above, Plaintiff did not have sufficient notice of, and did not manifest assent to, TTAC's hybridwrap website terms. Just as she should not be made to arbitrate her claims if she did not enter a valid agreement to do so, Shultz should not be made to forfeit her

1  rights to "a trial by jury," class action, or any "other representative proceeding of any kind." (Dkt.
2  14-3.)
3      Second, if the Court were to determine that Plaintiff entered into a valid and enforceable
4  agreement to waive any class action (she did not), the provision as written is so broad and
5  ambiguous as to be rendered substantively unconscionable. Unconscionability may be
6  procedural—if the offending terms are the result of inequal bargaining power and no opportunity
7  to negotiate—and substantive, which is found when contract terms are so harsh, oppressive, or
8  one-sided as to "shock the conscience." *Gatton v. T-Mobile USA, Inc.*, No. SACV 03–130 DOC,
9  2003 WL 21530185, at *10 (C.D. Cal. Apr. 18, 2003). The terms to which TTAC seeks to bind
10 Plaintiff are undoubtedly procedurally unconscionable. Plaintiff had no opportunity to negotiate
11 for contract terms of any kind; in fact, she was not even properly noticed of the terms of adhesion
12 that Defendant now seeks to enforce. As for substance, the class action waiver in particular is
13 substantively unconscionable due to its ambiguity and overbreadth. While the provision regarding
14 arbitration was limited to "Claims" against TTAC and arising from the user agreement, the class
15 action waiver provision features no limits whatsoever, rendering its applicability ambiguous and
16 impossibly broad. The opening sentence asks consumers to agree that both parties will waive the
17 right to a trial by jury, the right to participate in a class action, and the right to any other
18 representative proceeding. (Dkt. 14-3.) With no limitations included, this provision could
19 apparently apply to criminal cases, to unforeseeable future disputes, and even to claims that arise
20 against any other parties. It shocks the conscience that TTAC would demand that Shultz waive
21 her right to any jury trial in perpetuity, no matter the nature of the action. As written, this
22 provision would similarly bind TTAC, such that it could never seek a jury trial or engage in any
23 representative proceeding "of any kind." (*Id.*) The provision is substantively unconscionable.
24     Third, even if Defendant or the Court were to attempt to salvage this term by applying the
25 scope limit featured in the arbitration clause (which appears right above it), the waiver would then
26 only apply to those claims against Defendant that "aris[e] out of this User Agreement, or the
27
28 RESPONSE IN OPPOSITION TO             10
   MOTION TO COMPEL ARBITRATION              Case No. 4:20-cv-4375-HSG

1. purchase of any products or services." (Dkt. 14-2.) As explained previously in the context of the arbitration clause, Plaintiff's TCPA claim is extracontractual—it did not "arise" from any user agreement or purchase of products. Rather, TTAC attempted to solicit new business more than a year after it claims Shultz purchased one of its products. Thus, even if the class action waiver featured an appropriate limitation, Plaintiff's present TCPA claim would fall outside the scope of such waiver.

The Court should find that Shultz did not have sufficient notice or provide sufficient assent to the terms of adhesion hidden in Defendant's website. However, even if the contract were valid, the class action waiver is too broad and ambiguous to be enforced. Any limitation that TTAC or the Court may attempt to read into the clause would not encompass Plaintiff's extracontractual claim. As such, the request to strike Plaintiff's class claims should be denied.

**C.     TTAC's Alternative Request To Stay Is Inappropriate And Unsupported Because A Ruling In *Duguid* Will Not Dispose Of Or Alter Plaintiff's Claim.**

As an alternative to seeking a stay pending completion of arbitration (to which Plaintiff did not agree), TTAC briefly asks the Court to stay this case pending the Supreme Court's review of *Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019). (Dkt. 14 at 13–14.) The Supreme Court's ruling could theoretically change the definition of an ATDS, but it will not affect the foundation of Plaintiff's claim—no matter what is decided, this case will require discovery regarding the dialing technology used by TTAC, and Defendant cannot credibly demand delay of that discovery. Likewise, a stay is unsupported by the *Landis* factors—an indefinite delay of inevitable discovery would not support judicial economy and instead would prejudice Plaintiff's ability to obtain evidence. TTAC's request to stay should be rejected, and the Court should permit this matter to proceed to discovery.

As TTAC outlines in its motion, at issue in *Duguid* is the definition of an ATDS. The Ninth Circuit rejected the notion that an ATDS must use a random or sequential number generator to store numbers. *Duguid*, 926 F.3d at 1149–51. The U.S. Supreme Court granted certiorari on

RESPONSE IN OPPOSITION TO
MOTION TO COMPEL ARBITRATION                              11                              Case No. 4:20-cv-4375-HSG

July 9, 2020, for review of the following issue:

> Whether the definition of ATDS in the TCPA encompasses any device that can 'store' and 'automatically dial' telephone numbers, even if the device does not 'us[e] a random or sequential number generator.'

See Petitioner's Brief in *Facebook, Inc. v. Duguid, et al.*, Case No. 19-511, 2019 WL 5390116, at *ii (S. Ct. Oct. 17, 2019).

The Supreme Court will ultimately consider whether a dialer that does not use a "random or sequential number generator" may be considered an ATDS. While a decision in either direction could certainly impact TCPA litigation and the legal definition of an autodialer, it will not dispose of Plaintiff's claims or the requirement to demonstrate the use of an ATDS. Here, Plaintiff alleged in her complaint that Defendant used an ATDS, including "a random or sequential number generator." (Dkt. 1 at ¶ 38.) Thus, if the Court answers its question affirmatively, Plaintiff will no longer need evidence of a number generator to prove that Defendant used an ATDS. But regardless of the ruling in *Duguid*, Plaintiff must, through discovery, obtain evidence of the dialer that was actually used to send the text messages to herself and the class members—such evidence is in Defendant's possession, and it will be required no matter what the Supreme Court decides.

Nevertheless, TTAC claims that the requested stay is supported by the factors set forth in *CMAX*—(1) the possible damage that may result from granting a stay; (2) the hardship or inequity that a party may suffer by going forward; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay," commonly referred to as judicial economy. (Dkt. 14 at 13–14) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)). These factors are rooted in the Supreme Court's acknowledgement in *Landis* that courts have inherent power to control their own dockets, including the power to stay. *Id.* at 1109; *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Any party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to

someone else." *Id.* at 255.

Defendant's cursory analysis of the *Landis* factors is flawed—none of the factors favor a stay.

*Possible damage of granting stay*

TTAC's only assertion regarding potential harm to Plaintiff is that "there is no ongoing harm" because the text messages at issue were sent in November 2019, and Shultz has not alleged receipt of any new messages. (Dkt. 14, at 14.) But Plaintiff seeks injunctive relief in her Complaint, which is necessary to prevent TTAC from continuing its unlawful telemarketing practices directed not just to herself, but to any class members. (Dkt. 1 at 11 (seeking "[a]n injunction requiring Defendant to cease all unsolicited autodialed text messaging activities, and otherwise protecting the interests of the Class"); *see also id.* at ¶ 27.) Even if Shultz does not receive another message, every month that this matter is delayed is another month for Defendant to continue its automated telemarketing campaign to other consumers unchecked and exacerbate the harms at issue in the case. Further, and in addition to the harm associated with continued telemarketing, Plaintiff's ability to pursue this action would be harmed by a stay. Generally, a delay that results from a stay can harm plaintiffs because it threatens the availability of evidence. *Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr., Inc.,* 490 F.3d 718, 724 (9th Cir. 2007) (recognizing that "[d]elay inherently increases the risk that witnesses' memories will fade and evidence will become stale"). If Plaintiff is unable to issue discovery or subpoenas to secure evidence possessed by Defendant and its agents until the Supreme Court rules on *Duguid*—TTAC doesn't even provide an estimate as to when that may be—Shultz will be prejudiced in her ability to support her claim for relief. In short, Plaintiff will likely suffer harm if the case is stayed because she would be unable to even discover evidence material to her claims for the duration of any stay, during which time Defendant could continue its unlawful practices. This factor weighs against a stay.

*Hardship in proceeding*

TTAC's prediction that it would suffer "actual prejudice" and an "extraordinary waste of time and money" in the absence of a stay is rooted in its erroneous assessment of the *Duguid* case and of Plaintiff's claim. (*See* Dkt. 14 at 14.) Defendant insists that proceeding without a stay would result in "substantial supplemental briefing" to account for a new ATDS definition that the Supreme Court may adopt. (*Id.*) This is simply not true. As explained above, Plaintiff has alleged the use of "a random or sequential number generator." (Dkt. 1 at ¶ 38.) If the Supreme Court upholds the *Duguid* decision, Plaintiff could succeed on her claim even without specific evidence of a number generator; if the decision is overturned, Plaintiff will need such evidence to support her claim and meet the TCPA definition. But the *Duguid* decision cannot and will not dispose of Plaintiff's case because she did not predicate her claim on allegations that TTAC's system merely dialed from a stored list—when proven after appropriate discovery, Shultz's allegations would satisfy the autodialer definition either way. The requested stay would only delay necessary and inevitable discovery; TTAC will not suffer hardship in proceeding, aside from the ordinary expenses associated with litigation, which are certain and insufficient to justify postponing this matter for an unspecified period of time. *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) ("[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity.'") Thus, this factor does not favor granting the requested stay.

*Judicial economy*

Likewise, judicial economy would not be served by a stay. Defendant once again relies on its mistaken belief that the *Duguid* decision would dramatically alter or otherwise resolve issues in this case. (Dkt. 13 at 12) (claiming "[t]here is no more clear example of the efficiencies gained by a stay"). In response to a similar request in another TCPA case, the District of Arizona reasoned that "regardless of the results in *Facebook* [*v. Duguid*]…[the defendant] will be required to engage in discovery." *Whittaker v. All Reverse Mortgage Inc.*, No. CV-20-08016-PCT-DLR, dkt. 26 at 2 (D. Ariz. July 17, 2020) (attached hereto as "Exhibit B"). "[O]nce the Supreme Court releases its decision defining ATDS, Plaintiff still would be entitled to conduct discovery into

Defendant's systems to determine whether those systems met the ATDS definition. In fact, Defendant has not pointed to a single discovery issue that would be eliminated by a *Facebook* decision favorable to it . . . ." Ex. B at 2. The court denied the motion to stay because "discovery issues are not likely to be mooted and resources are not likely to be spared" by awaiting *Duguid*'s outcome to begin discovery that is necessary regardless. *Id.* The same holds true here—TTAC cannot credibly suggest that the *Duguid* decision will moot any discovery issues because: (1) Plaintiff's allegations are not based solely on the use of a system that dials from a stored list of numbers; and (2) Plaintiff will require discovery into Defendant's dialing system regardless of what the Supreme Court decides.

In short, there is no support for staying this matter until the Supreme Court issues its ruling in *Duguid* and postponing all proceedings indefinitely. This is not one of the "rare" instances where a party should be made to stand aside while a pertinent rule of law is decided. *Landis*, 299 U.S at 255. Judicial economy would not be served by postponing this case for an unspecified period of time, based only on Defendant's misguided belief that a Supreme Court decision would drastically alter Plaintiff's cause of action. Further, given that Shultz would likely suffer harm in the form of evidence becoming unavailable if such a stay is granted, and that TTAC will not suffer any harm beside the inevitable cost of litigation, the requested stay is inappropriate. Defendant's alternative request to stay this matter should be denied.

### IV.     CONCLUSION

Defendant's Motion should be denied in its entirety. TTAC's website terms, including the arbitration mandate, are not part of a valid contract that may be enforced against Plaintiff for lack of adequate notice and assent. Nevertheless, even if the terms were enforceable, Shultz did not agree to arbitrate her TCPA claim—the arbitration clause does not encompass this cause of action. Likewise, Defendant's class action waiver clause is unconscionably broad and ambiguous, and it cannot be used to strike Plaintiff's class claims. Further, in regards to TTAC's alternative request to stay the case, the Supreme Court's upcoming review of the ATDS definition in *Duguid*

will not dispose of or otherwise alter Plaintiff's claim, and the *Landis* factors do not support staying inevitable discovery and proceedings. Accordingly, the Court should deny the motion, permit the parties to proceed, and award any such relief as it deems necessary and just.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: September 25, 2020 | **MICHELLE SHULTZ**, individually and on behalf of all others similarly situated, |
|  | By: /s/  Patrick H. Peluso |
|  | Richard T. Drury (SBN 163559)<br>richard@lozeaudrury.com<br>Rebecca Davis (SBN 271662)<br>rebecca@lozeaudrury.com<br>**LOZEAU DRURY LLP**<br>1939 Harrison, Suite 150<br>Oakland, CA 94612<br>Telephone: (510) 836-4200<br>Facsimile: (510) 836-4205 |
|  | Patrick H. Peluso*<br>ppeluso@woodrowpeluso.com<br>Taylor T. Smith*<br>tsmith@woodrowpeluso.com<br>**WOODROW & PELUSO, LLC**<br>3900 East Mexico Avenue, Suite 300<br>Denver, Colorado 80210<br>Telephone: (720) 213-0676<br>Facsimile: (303) 927-0809 |
|  | *Attorneys for Plaintiff and the Class* |
|  | * Pro Hac Vice |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the above titled document was served upon counsel of record by filing such papers via the Court's ECF system on September 25, 2020.

/s/ Patrick H. Peluso