UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE SHULTZ,<br><br>        Plaintiff,<br><br>v.<br><br>TTAC PUBLISHING, LLC,<br><br>        Defendant. | Case No. 20-cv-04375-HSG<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 14 |

Pending before the Court is a motion to compel arbitration filed by Defendant TTAC Publishing, LLC. *See* Dkt. No. 14. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. See Civil L.R. 7-1(b). For the reasons detailed below, the Court **DENIES** the motion.

**I.   BACKGROUND**

Plaintiff Michelle Shultz filed this action against Defendant on June 30, 2020. *See* Dkt. No. 1 ("Compl."). Plaintiff alleges that she received a series of unsolicited telemarketing text messages on her personal cellular telephone by or on behalf of Defendant beginning in November 2019. *See id.* at ¶¶ 8–10, 14–15, 17, 19, 21–22. She further alleges that these text messages were sent using an automatic telephone dialing system. *See id.* at ¶¶ 13, 20. Plaintiff denies ever providing her prior express consent to receive such texts. *See id.* at ¶¶ 14, 21–22. On the basis of these facts, Plaintiff brings a single cause of action for violation of the Telephone Consumer Protection Act, 42 U.S.C. §§ 227 *et seq.* ("TCPA"). She seeks to represent a putative class, defined as:

> All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the

> Class; (2) received at least one text message from Defendant, or a third person acting on behalf of Defendant; (3) on the person's cellular telephone; (4) for the purpose of selling Defendant's products or services; (5) using the same dialing system that was used to send the text messages to Plaintiff; and (6) for whom Defendant claims it obtained prior express written consent in the same manner as Defendant claims it supposedly obtained prior express written consent to send text messages to Plaintiff.

*Id.* at ¶ 28. She seeks statutory damages of $500 per violation and injunctive relief, as well as attorneys' fees and costs. *See id.* at 11 ("Prayer for Relief").

Defendant now moves to compel arbitration, or in the alternative to strike the claims of the putative class or stay this action. *See* Dkt. No. 14.

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (same). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524,

1  530 (2019) (citing 9 U.S.C. § 2).

## III. DISCUSSION

### A. Motion to Compel

In support of its motion to compel arbitration, Defendant contends that on April 13, 2018, Plaintiff visited Defendant's website, https://thetruthaboutcancer.com, and purchased a digital copy of a documentary film offered for sale on that site. *See* Dkt. No. 14-1 ("Bollinger Decl.") at ¶ 7. While completing her purchase, Plaintiff provided certain personal identifying information, including her phone number. *See id.* at ¶ 8. Defendant argues that on the checkout page of the website, Plaintiff also explicitly acknowledged that she agreed to be bound by Defendant's Terms and Conditions. *Id.* at ¶¶ 9, 15. Defendant explains that a pre-checked checkbox, with the phrase "I agree to the terms and conditions" beside it, appears at the bottom of the checkout page and above the "Complete Purchase" button. *See* Bollinger Decl. at ¶¶ 5, 8; *see also* Dkt. No. 21 at 2–7. And the Terms and Conditions are in blue font and hyperlinked, as reproduced below. *See id.*



Defendant contends that Plaintiff—and all consumers making purchases on Defendant's website—therefore indicated her agreement to the Terms and Conditions by clicking on the "Complete Purchase" button. *See* Bollinger Decl. at ¶ 15.

Defendant further argues that the Terms and Conditions, in turn, include an arbitration provision that provides:

> [Y]ou agree that all claims, disputes, or controversies against [Defendant] arising out of this User Agreement, or the purchase of any products or services ("Claims") are subject to fixed and binding arbitration (except for matters that may be taken to small claims court), no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law . . . .

*Id.* at ¶¶ 10–12; *see also* Dkt. No. 14-2, Ex. 1. The Terms and Conditions also include a waiver of any right to a jury trial, as well as the right to bring claims as a representative or member of a class action:

> You agree that, by entering into this user agreement, you and [Defendant] are each waiving the right to a trial by jury or to participate in a class action, collective action, private attorney general action, or other representative proceeding of any kind. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration only on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

*Id.* at ¶¶ 13–14; Dkt. No. 14-3, Ex. 2.

Plaintiff does not appear to contest Defendant's representations about the design and content of the website or the Terms and Conditions. Instead, she responds that (1) the website did not create, and she did not manifest assent to, a valid arbitration agreement between the parties; and (2) even if there were a valid agreement, the alleged arbitration provision does not cover the dispute at issue. *See* Dkt. No. 18 at 4–9.

### i. Arbitrability

As a threshold matter, Defendant contends that the arbitrator, and not the Court, should

4

decide whether the parties entered into a valid arbitration agreement. *See* Dkt. No. 14 at 3–4. Here, however, Plaintiff challenges whether there is an agreement between the parties at all. And the Ninth Circuit has held that "challenges to the very existence of the contract are, in general, properly directed to the court." *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) (citations omitted); *see also Galilea, LLC v. AGCS Mar. Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018) (noting that the court "must first make a threshold finding that the document [evidencing an agreement] at least purports to be . . . a contract.") (quotation omitted). To hold otherwise, the Ninth Circuit has explained, "would lead to untenable results." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991). For example, "Party A could forge party B's name to a contract and compel party B to arbitrate the question of the genuineness of its signature." *Id.* "It is axiomatic that '[a]rbitration is a matter of contract and a party cannot be required to submit any dispute which he has not agreed so to submit.'" *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) (quoting *AT & T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986)). The Court therefore considers below whether the parties entered into an agreement to arbitrate.

### ii. Existence of Arbitration Agreement

When the parties contest whether an agreement was formed, the Court applies "general state-law principles of contract interpretation," without a presumption in favor of arbitrability.[1] *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (quotation omitted). The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence that there was an agreement to arbitrate. *See Norcia v. Samsung Telecomms. Am., LLC*,

---

[1] Here, the Terms and Conditions contain a Tennessee choice-of-law provision. *See* Dkt. No. 14-2, Ex. 1. However, because Plaintiff challenges whether the Terms and Conditions are enforceable against her at all, the Court applies California's choice-of-law rules. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) ("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law.") (quotation omitted); *see also* Compl. at ¶ 4 (alleging diversity exists for purposes of CAFA jurisdiction). In California, "[g]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." *See Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 919 (Cal. 2001) (quotation omitted). Even if Tennessee law applied, however, the parties have not indicated that it materially differs from the California law. The Court therefore applies California law to the extent necessary to determine contract formation.

845 F.3d 1279, 1283 (9th Cir. 2017). Conversely, the party opposing arbitration is entitled to the benefit of all reasonable doubts and inferences. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). Therefore, a court may find that an agreement to arbitrate exists as a matter of law "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Id.* (quotation omitted); *see also Alarcon v. Vital Recovery Servs., Inc.*, 706 F. App'x 394, 394 (9th Cir. 2017) (same).

As the Ninth Circuit has explained, when determining whether there is a binding agreement formed through websites, courts generally evaluate contracts as falling into one of two categories: (1) "browsewrap" agreements where the website's terms and conditions are provided to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by her continued use of the website; and (2) "clickwrap" agreements where a user is presented with the terms and conditions and must click on a button or box to indicate that she agrees before she may continue. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–77 (9th Cir. 2014). Websites may also present some hybrid of the two, such as putting a link to the terms and conditions on the web page near a button that the user must click to continue. Regardless, "the onus [is] on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1178–79.

Here, the parties appear to agree that Defendant's website offers a type of hybrid browsewrap agreement. *See* Dkt. No. 21 at 1–7. Although it contains a checkbox next to the statement "I agree to the terms and conditions," by default, the checkbox is already checked when a customer navigates to the checkout page. *See* Bollinger Decl. at ¶¶ 5, 8; *see also* Dkt. No. 21 at 2–7. The user, therefore, does not have to click on the checkbox itself to manifest her assent before she may continue with her purchase. *See id.* Instead, she need only click on the large "Complete Purchase" button. *See id.* A browsewrap agreement is valid if "the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176 (quotation omitted). Despite Defendant's urging, *see* Dkt. No. 21 at 2, n.1., there is no evidence in the record that Plaintiff had actual notice of the Terms and Conditions here. And there is no dispute that Defendant's website did not require its users affirmatively to acknowledge the Terms

and Conditions during purchase. In the absence of such actual notice, the Court must evaluate "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design" in determining "whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *See Nguyen*, 763 F.3d at 1177.

Defendant argues that the webpage speaks for itself: the statement "I agree to the terms and conditions" is placed directly above the "Complete Purchase" button, and the phrase "terms and conditions" is hyperlinked in blue. *See* Dkt. No. 21 at 2–3. But "the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice." *Nguyen*, 763 F.3d at 1178. As the Ninth Circuit cautioned, "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1178–79. And in reviewing the checkout webpage, the Court finds that the webpage design makes it exceedingly difficult to discern the significance of the hyperlink:

- The phrase "I agree to the terms and conditions" is in very small text, and is dwarfed by the large and colorful green "Complete Purchase" button below it. *Accord Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL 5210912, at *3 (N.D. Cal. Sept. 1, 2020).
- Although the hyperlink to the Terms and Conditions is in light blue, it is not underlined, highlighted, in all caps, or otherwise set off from the page. *Accord Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764–66 (N.D. Cal. 2019) (collecting cases). The blue coloring, alone, could be for aesthetic purposes, as it appears to be for the larger blue "PayPal" symbol listed in the payment information section above the terms and conditions hyperlink and in the promotional language to the right of the terms and conditions hyperlink.
- The checkout page also has what appears to be a promotional video playing in the top left corner of the webpage, and the volume appears to be at its maximum level.
- To the right of the terms and conditions hyperlink and "Complete Purchase" button is further promotional material about the soon-to-be-purchased product. This

advertisement includes a colorful image and several large green checkmarks beside the content included with the purchase.  These green checkmarks are several times larger than the terms and conditions hyperlink, and obscure the import of the checkmark beside the hyperlink.

As the Ninth Circuit has indicated, courts often decline to enforce agreements where users must "parse through confusing or distracting content and advertisements" to find the terms.  *See Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) (citing *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019); *accord Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) (affirming denial of motion to compel arbitration where "[e]ven though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention.").  Similarly, here, the design and content of the checkout process distracts users from recognizing the existence of, and need to review, the Terms and Conditions, and the hyperlink was not conspicuous enough to put Plaintiff on inquiry notice.  The Court finds that Plaintiff is therefore not bound by the Terms and Conditions generally, or the arbitration provision more specifically.[2]

**B.    Motion to Strike**

Alternatively, Defendant moves to strike the class action allegations in the complaint.  *See* Dkt. No. 14 at 9–12.  Federal Rule of Civil Procedure 12(f) provides that a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  *See* Fed. R. Civ. P. 12(f).  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ."  *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir.

---

[2] Because the Court finds that Plaintiff is not bound by the Terms and Conditions because no agreement to arbitrate was formed, it does not reach Plaintiff's secondary argument that this case falls outside the scope of the arbitration provision.

2010).  Motions to strike are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.  *See Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991).  Moreover, "such motions are generally disfavored because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits."  *See Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010).  Defendant's motion to strike is premised on the same argument that, like Plaintiff, class members who received text messages from Defendant also agreed to the Terms and Conditions when completing purchases on Defendant's website.  *See* Dkt. No. 14 at 1–2.  For the reasons explained in Section III.A.ii. above, the Court **DENIES** the motion to strike.

### C. Motion to Stay

Lastly, Defendant requests in the alternative that the Court stay the action pending the Supreme Court's ruling in *Facebook, Inc. v. Duguid*, No. 19-511, 2020 WL 3865252, at *1 (U.S. July 9, 2020).  *See* Dkt. No. 14 at 12–14.  In the underlying action, the Ninth Circuit rejected the argument that an automatic telephone dialing system ("ATDS") must use a random or sequential number generator to store numbers for purposes of the TCPA.  *See Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1149–51 (9th Cir. 2019).  Rather, the Court held that "it suffices to merely have the capacity to 'store numbers to be called' and 'to dial such numbers automatically.'"  *Id.* at 1151.  The Supreme Court granted certiorari on the issue of the correct interpretation of the term ATDS.

Defendant urges that a stay pending this ruling is appropriate because a key issue in Plaintiff's prima facie case is establishing that the text messages at issue in this case were sent through an ATDS.  *See* 47 U.S.C. § 227(b)(1)(A).  The definition of ATDS could, Defendant suggests, alter the scope of discovery in this case.  The Court is not persuaded.  Here, Plaintiff alleges in her complaint that Defendant used an ATDS, including "a random or sequential number generator."  *See* Compl. at ¶ 38.  Although the Supreme Court's ruling in *Facebook* may alter the definition of an ATDS, the nature of the system that Defendant used for making the alleged text messages will be an important issue for discovery in this action regardless of the definition.  The Court therefore **DENIES** the motion to stay.

## IV. CONCLUSION

Accordingly, the Court **DENIES** the motion in its entirety. The Court further **SETS** the initial case management conference for November 10, 2020, at 2:00 p.m. All parties, counsel, and members of the public and press may use the following dial-in information below to access the conference line:

**Dial In:** 888-808-6929

**Access Code:** 6064255

The parties shall also file any amended joint case management statement by November 3, 2020, and be prepared to discuss how to move this case forward efficiently.

**IT IS SO ORDERED.**

Dated: 10/26/2020

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge